DISTRICT COURT.                                    OCTOBER 21, 1859.
                          ADMIRALTY.

## THE UNITED STATES *v.* THOMAS DODD.

Mutiny on shipboard. Act of 3d March, 1835, in relation thereto. Degree and justification of means for suppression. Effects of the abolition of flogging, and review thereof. The practice of employment of seamen on shore without inspection by master or other officer, condemned. Payment of wages in advance, condemned.

HABEAS CORPUS.

The facts were these:

THOMAS DODD and others of the crew of the ship Sir John Franklin, of Baltimore, were committed on a charge of mutiny and conspiracy to make a revolt on board of her, in a voyage from Liverpool to Philadelphia. The vessel is of the burthen of about 1,000 tons. On the 16th of July last, she sailed on this voyage, with a company of twenty-four persons, of whom twelve have been thus committed. According to the testimony before the commissioner, Dodd, on the fifth day of the voyage, called the watch on duty from their work. They went aft upon his call. The mate followed them. They asked for the captain, who, at the request of the mate, came. Through Dodd, as their spokesman, they complained of their food. The captain told them that his orders had been to provide for them well and abundantly. They then changed their ground of complaint, saying that they wanted *watch and watch*. The meaning of this phrase is, that in the daytime, as at night, none but the men of whom the watch on deck is composed shall be required to perform any duty. They said that they were a crew picked for the vessel, and that they intended to have

watch and watch. The captain said that they should not have it until he was ready to allow it to them, or words to that effect, adding that they had better go to work, and that if they did he would treat them kindly. They then refused to do duty. The watch had shortly before been changed. Dodd asked the watch that had been turned off whether they were men or mice, telling them that, if they could not get watch and watch, they ought to take it; some of them said that they *would* take it.

The captain then again ordered them to their work. They refused, some of them saying that he might put them in irons, or go back to Liverpool and put them in jail. He told them that he would do no such thing, but if they did not go to their work would blow their brains out. Some of them told him to shoot and be damned, that they did not care. He then drew a pistol and shot Dodd, who appears to have been the ringleader, wounding him slightly, but in a part of the body where a shot might have been fatal. The captain then again ordered the men to their duty, saying that if they refused he would shoot others. They did not at once obey. One of them, named Stretch, told him to shoot again and be damned. He, however, did not fire again. They soon after submitted. All of them resumed work except the wounded man, who went to bed. He was afterwards put in irons. There was no proof of any subsequent insubordination of a serious character.

The parties committed were brought before the Court on a habeas corpus. By consent of the counsel, the case was heard upon the commissioner's report of the testimony taken before him, as above stated. The District Attorney informed the Court that the captain, against whom no charge had been made, and on whose complaint the prosecution against the crew had been instituted, was desirous that the case should be no further prosecuted. The District Attorney stated likewise that, so far as the public interest was concerned, he did not think it his duty to object to the discharge of the prisoners, if the Court, upon the case presented, would sanction the abandonment by him of the prosecution.

THE COURT having inquired what proportion of the wages

of the crew had been paid in advance, and whether the crew had been engaged by the captain or mate, or mustered or inspected by either of them before the commencement of the voyage, the captain was examined. He stated that the crew. had received, each man, a month's wages in advance; that they came on board when the vessel was about leaving her moorings, and that not a man of them had been engaged, or seen, by himself or by the mate.

## CADWALADER, J.

The practice of paying so large a portion of the crew's wages in advance as to give them no interest in the voyage cannot be too strongly censured. It has probably been the cause of this crew's insubordination. The policy of the maritime law is to secure to the crew their wages, on condition that the vessel survives the voyage, and that they perform their duty. Their lien for wages, under these conditions, is peculiarly favored and effectually secured. But the wages are lost if the vessel is lost, and are forfeited if their duty as navigators is violated. An advance of a reasonable proportion of their wages does not altogether frustrate this policy. But it is altogether frustrated by the practice of paying to them in advance an amount of money so great that, if the voyage proves to be a short one, they remain in debt to the vessel, which they usually leave immediately on her arrival in port. Formerly the fear of a forfeiture of wages was an effectual preventive, or check, of insubordination of a mutinous tendency. But this aid in maintaining the necessary discipline on board is lost under this injudicious practise. In the present case, the men who had already received a month's wages had no objection to the vessel, when five days out, putting back to her port of departure. They appear to have thought that the captain would have been compelled to choose between this alternative and compliance with the terms which they strove to dictate.

Another bad practice is that of confiding the selection of the crew of a vessel entirely to an agent on shore, without even an inspection of them by her captain or other officer. This prac-

tice is opposed to essential interests of navigation, and, therefore, cannot be excused by its alleged prévalence on both sides of the Atlantic. A vessel without a competent crew is, in law, unseaworthy. Her principal navigator is responsible to God and man for inattention to their selection. The cargoes of merchant vessels trading between this country and certain ports of Europe are now seldom taken in, or unladen, by their crews. This business is often performed advantageously by stevedores and other landsmen. The consequence has been that crews for voyages in this trade are now usually shipped just as the vessels are leaving port; and at the end of their outward voyages are discharged, other crews being shipped for the return voyages. The employment of trustworthy shipping agents may, therefore, be convenient and unobjectionable. But the selection of the crew cannot be trusted so exclusively to such middlemen as to dispense with attention by the principal navigator of a vessel to the question of their competency. This view of the subject is, I believe, already in part understood in some of our ports, where the men are no longer shipped without being seen or conversed with. It will soon, from necessity, be understood everywhere. The point is now of greater importance than formerly, when the persons who did not ship as boys or apprentices were usually men who had been trained as navigators. In this respect the system has, of late years, been greatly changed. Apprenticeships from our ports are now almost unknown. The numerous cases of daily occurrence in which dangers or difficulties at sea are encountered from the incompetency or insubordination of the crews of merchant vessels teach an appalling lesson of the necessity of increased caution in their selection or approval.

As the crews in this trade are very seldom shipped for the round voyage, they are frequently composed of men of different nations, whose laws differ as to the discipline on board of their vessels. The difficulty of maintaining a uniform system of discipline on board is often, therefore, very great. The United States, for example, have, of late, prohibited flogging as a punishment. This was, I think, a wise act of legislation. I know

that many merchants and navigators of great experience entertain a different opinion. Some of them rest their objection to this change of the law upon the reason that other nations continue to permit flogging, and that English and other mariners accustomed to see the discipline of a ship enforced by this punishment become insubordinate in vessels in which it cannot be inflicted.

According to this mode of reasoning, no improvement in the system of maritime discipline could ever be effected without a simultaneous occurrence in the legislation of all civilized governments. This concurrence cannot be expected. In matters which concern all mankind alike, legislative improvements are often thus begun by a single nation. They afterwards extend themselves gradually, as experience tests their usefulness and practicability. In the meantime, incidental difficulties may occur. They almost always arise, in a greater or less degree, from innovations, even from the wisest. When such difficulties occur, they must be encountered and overcome. The abolition of this degrading punishment, when it was prohibited in our vessels by the act of 1850, was a necessary improvement in the law of navigation.

It only restored a rule of the former maritime code of Europe. Until a period long after the mariner's compass was, to some extent, in use, those who followed the business of navigation were not a class of citizens as distinct from landsmen as they afterwards became. Winter voyages, which had been prohibited by the Greeks and Romans, were likewise, until after this period, prohibited by the laws of the most commercial states of Europe. (See Pard. Col. Mar. VI 655, Tit. "Hivernage," and II, 148, 149.) For several months of the year they were, therefore, on shore. During the first of the year navigators were seldom for long periods out of sight of land. Their most important commercial enterprises were trading voyages, from port to port, along the coasts, or to the European islands. Moreover, no merchant vessel was at any time exempt from liability to be called into the service of her nation, for purposes of state or of war.

When thus called into the public service, which very often occurred, the crews of each vessel in a fleet, in some countries, elected their own captain, subject to the approval of the government, the commander only of the fleet being directly appointed by the state. When engaged in private commercial navigation, the rule and the practice was, that the captain, on all important questions, whether to set sail, to make a port, or lighten the vessel in a storm, etc., should consult the ship's company. In those days the strictest discipline was enforced. Punishments of a serious kind were inflicted, sometimes on arrival in port, sometimes on board of the vessel. A mariner might in some cases be put to death. In others he was liable to the loss of his hand. Every mutinous tendency might be promptly repressed. Obedience to orders was enforced by the severest penalties. The mariner was expressly required to submit even to a blow struck by the master; but if the blow was repeated, he might, in self-defence, resist the master. (Ib. I, 332, 378; II, 146.)

Thus, where punishment much more severe might be imposed, flogging was deemed unlawful. But afterwards, when distant voyages of long duration became usual, with no interval of rest in the winter season, mariners were almost exiled from association with landsmen. Maritime laws could no longer be made upon land, but were adopted necessarily from usages of the sea. These usages were, in some respects, brutalized among the semi-piratical navigators from Spain, Portugal, and England, afterwards engaged in voyages of discovery and of colonization, or in the trade with new settlements in remote regions. In the meantime, the navies of the state and the merchant marine had been separated, except when the navigators of merchant vessels were employed as privateers, in a system of warfare which had no tendency to improve bad habits acquired in time of peace. During some of these periods, the practice of imposing flogging as a punishment, in men-of-war and in merchant vessels, in time of peace and of war, became prevalent. Because of this prevalence, its lawfulness was recognized.

Before the independence of the United States, our trade had been with England alone. The lawfulness of this mode of punishment in English vessels had been unquestionable. It therefore became lawful in vessels of the United States, and continued to be lawful until the Act of 1850. Before that act the experience gained in whaling voyages and in some other kinds of navigation, in which the crew participated in the profits, had shown that the former degradation of the service of a mariner was not always essential to subordination. A necessary measure for the removal of this degradation has been the prohibition of flogging. As an experiment it cannot, as I have intimated, be fairly tried without some incidental difficulties. These difficulties, when encountered, must, as I have said, be overcome.

It would often be unjust to ignore their existence. It cannot be disregarded in a case like the present, when the crew, taken in at an English port, were not unlikely to become insubordinate in a vessel in which flogging was known by them to be prohibited. This was an additional reason for the captain to have made himself acquainted with the character of the crew before they were shipped. But it might, after they were shipped, have a tendency to excuse, and, in some cases justify, the use of a pistol in order to quell an intended revolt.

The captain of this vessel, in an inquiry like the present, is not to be made responsible for his conformity to injudicious practices which prevail to such an extent that he, alone and without support, could not, in a foreign country, have assumed the part of a reformer. He probably could not have obtained a crew without making such an advance, as the captains of other merchant vessels had paid without objection on the part of their owners, or of insurers. He probably could not have dispensed with the employment of a shipping agent. The intervention of such an agent did not excuse the omission to see and converse with the men before they signed the articles. But as the occurrence in question did not happen until they had been five days on board, the circumstance is less material than if the difficulty had occurred immediately on leaving port.

The embarrassment of this case arises from the circumstance that a pistol was fired, and that the shot took effect in such a manner that the captain cannot be justified unless he would have been excusable if it had resulted in the death of the man who was wounded.  It is true that no prosecution against the captain has been instituted, and that his conduct, under the circumstances, may have been justifiable, from the necessity of suppressing an incipient mutiny.  But the difficulty consists in determining whether a case of such insubordination as would, on this ground, excuse him of firing the shot, is not of too serious a character to be disposed of until it shall have been passed upon by a jury.

The act of Congress of 3d March, 1835, as it has been judicially interpreted, extends the definition of a revolt or mutiny at sea, so that it includes cases to which the previous legal definition of the offence did not apply.  Under this act, every combination to resist the free and lawful exercise of the commander's authority · in indictable.  The distinction between mere insubordination requiring punishment in order to maintain the discipline of a vessel, and an offence of such a character as requires or excuses the use of a deadly weapon, in order to secure the safety of a vessel, is one which cannot always be readily drawn.  In a case of the latter character, there would be no security to navigation if we were to draw nice distinctions as to the course to be pursued by a captain.  The rule of his conduct is that which a sound and well-regulated discretion may suggest.  His own judgment, if discreetly exercised, is thus, within certain limits, the only rule.

The use of a pistol must, however, always render the case one for very serious consideration.  If the insubordination had been that of a single seaman, or if a small number only of the crew, the use of a pistol could not have been justified under circumstances like those of the present case.  The case presented, however, is not that of a single offender, but that of a combination, in which a sufficient number of the men were associated to render their immediate subjection to discipline essential to the security of the vessel.  If this be the true view

of the case, a great part of its difficulty is removed. It may then be considered with a sole reference to the conduct of the men, independently of any ulterior question as to that of the captain.

Under the act of 1835, cases may be indictable in which the District Attorney may, with great propriety, forbear to prosecute parties who, in other modes, have already been punished sufficiently. Thus, where wages have been forfeited, or where damages have been awarded on the civil side of the court, there would sometimes, in cases where the guilt has not been aggravated, be more cruelty than justice in pressing a prosecution. In this case, while he does not abandon absolutely the prosecution, his official opinion that it should not be further pressed is very distinctly intimated.

If the defendants could have a speedy trial, I should think the case one which, unless absolutely abandoned by the District Attorney, on his official responsibility, should be passed upon by a jury. But the parties charged have already been imprisoned for more than a month. The jury for the present term had been discharged before the arrival of the vessel at this port. Upon an application of the counsel of the prisoners, or of the United States, the Court would have ordered a special venire, so that a trial might have been had before this time. But no such application was made, and no blame can be imputed for having awaited the ordinary course of judicial business.

In the meantime, the original counsel of the defendants has died. At present, no arrangement could be made for their trial before the latter part of next month. As the parties and witnesses are all engaged in the business of navigation, this additional delay until the approach of the winter season might result in excessive hardship. Therefore, as a speedy trial cannot be had, I will not, after the statements which have been made by the District Attorney, detain the parties longer in custody. But I have not without great hesitation arrived at this conclusion. Let an order be made for their discharge.